UNITED STATES of America,
Plaintiff,

v.

Karim KOUBRITI, et al., Defendants.

No. 01–CR–80778.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 12, 2004.

Asst. U.S. Attorney Eric Strauss, Detroit, MI, for the Government.

Leroy Soles, Rick Helfrick, James Gerometta, Federal Defenders Office, Detroit, MI, for Defendant Koubriti.

Jim Thomas, Detroit, MI, for Defendant Hannan.

Bill Swor, Detroit, MI, for Defendant El Mardoudi.

Steve Rabaut, St. Clair Shores, MI, for Youssef Hmimmsa.

*MEMORANDUM OPINION AND ORDER REGARDING INVOCATION OF THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION BY MILTON "BUTCH" JONES*

ROSEN, District Judge.

## I. *INTRODUCTION*

This matter is presently before the Court for a determination of whether Milton "Butch" Jones, a potential witness in this action who is a capital defendant in another pending federal action, is entitled to invoke a Fifth Amendment privilege against self-incrimination and refuse to answer any questions asked of him concerning a letter ostensibly written by him to Assistant United States Attorney Joseph Allen (the "Jones letter") and contemporaneous notes which, as indicated in the letter, Jones kept concerning statements made to him by Youssef Hmimssa, a cooperating defendant, and key government witness, in this case. This letter, and Jones's notes, contain information bearing on Hmimssa's credibility and which is ar-

guably exculpatory—and, therefore, arguably *Brady* and/or *Giglio* material—as to Defendants in this case. Neither the letter nor the notes were turned over to Defendants by the Government either prior to trial or during trial, despite the fact that the Government prosecutors had the letter, and, on its face, the letter contains *Brady* and/or *Giglio* material.[1]

Jones maintains that the Fifth Amendment privilege against self-incrimination entitles him to refuse to produce the letter or his notes and also to refuse to provide any testimony whatsoever concerning them. Defendants oppose Jones's assertion of the Fifth Amendment privilege for any purpose.

Jones, through counsel, as well as Defendants Koubriti, Hannan, and Elmardoudi, filed sealed briefs on this issue, and on December 23, 2003, the Court conducted an *in camera* ex-parte sealed hearing on this matter. During this hearing at which both Jones and his attorney were present, the Court reviewed both the Jones letter and Jones's notes, and questioned Jones at length regarding the contents of these writings, Hmimssa's statements to him, and his assertion of the privilege.

Although the legal issues presented by Jones's Fifth Amendment invocation are nuanced and challenging, two things are very clear to the Court, the parties, and Mr. Jones: If the Court were to fully abrogate Jones's privilege, he could, theoretically, face some jeopardy arising out of this material and its foundational testimo-

---

**1.** An interesting side note which provides more complete context to this matter—although is not directly necessary to a decision on the privilege issue—is that at a hearing conducted by this Court as to why the Government did not turn the letter over, all Government lawyers conceded that it should have been turned over to the Defendants. In fact, the then Chief Assistant United States Attor-

ney stated at this hearing that when he became aware of the Jones letter during trial, he met with one of the two prosecutors on the case and ordered him to turn the letter over to Defendants. However, at the same hearing, that prosecutor contradicted the Chief Assistant and denied ever receiving such an order.

ny in his capital case. On the other hand, if the Court were to grant Jones the full scope of the Fifth Amendment privilege he asserts, this could well have the effect of keeping arguably exculpatory information from the Defendants here, thereby undermining their motion for a new trial.

Having reviewed and considered the parties' briefs, the letter and notes at issue, and Mr. Jones's *in camera* sealed testimony, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

On December 12, 2003, this Court conducted a post-trial evidentiary hearing regarding the failure of the Government to disclose, either during pretrial discovery or during the course of the seven-week trial of this case, a letter sent to the U.S. Attorney's office which ostensibly was written by Milton "Butch" Jones, a defendant in a capital case which is currently pending before the Honorable John Corbett O'Meara. The letter was not produced to defense counsel in this case until November 18, 2003, i.e., almost six months after the jury returned its verdict in this case, and the Government's belated post-trial production of the letter is one of the subjects raised by Defendants in connection with their pending Motion for New

Trial.[2] The Court did not receive the letter until December 8, 2003 and was unaware of its existence prior to that date.

Butch Jones is under indictment and awaiting trial before Judge O'Meara on charges of operating a continuing criminal enterprise, participating in a conspiracy to distribute cocaine and marijuana, and intentional killing (two counts). The Government has filed a Notice of its Intent to seek the death penalty upon conviction of Jones for the two capital offenses.

The Jones letter at issue in this case is dated December 30, 2001 and is addressed to Assistant United States Attorney Joseph Allen, the prosecutor in death penalty case against Jones. In the letter, Jones wrote that for approximately two weeks in December 2001, he was incarcerated at the Wayne County Jail in the maximum security ward in a cell adjacent to that of Youssef Hmimssa, a cooperating defendant in this case whose five-day testimony was a central part of the Government's terrorism case against Hmimssa's Co–Defendants, Karim Koubriti, Ahmed Hannan and Ahmed–Ilah Elmardoudi.[3] According to the letter, during the time that Jones and Hmimssa were both incarcerated in the maximum security ward at Wayne County Jail, Hmimssa told Jones, among other things, that he had lied to the FBI and "fooled" the Secret Service Agents on

---

**2.** *See* Defendants' Second Supplemental Memorandum in Support of Motion for New Trial and Request for Dismissal for Continued *Brady* Violations.

**3.** By stipulation of the parties, prior to trial, Hmimssa was severed from the case against Koubriti, Hannan and Elmardoudi and pled guilty to a number of charges of document fraud, credit card theft and credit card counterfeiting arising out of three separate indictments filed in this Court, in the Northern District of Iowa and in the Northern District of Illinois. The charges against Hmimssa in these three indictments carry a cumulative

total statutory maximum penalty of 81 years imprisonment and a $2,500,000 fine, plus forfeiture. In exchange for his cooperation and testimony at trial in this case, the Government stipulated in a Rule 11 Agreement to a sentencing range of 37 to 46 months and further agreed to, and has, in fact, requested a more than 50% downward departure from that range for "substantial assistance." Hmimssa has yet to be sentenced, however, and his sentencing has been adjourned without date pending resolution of the instant matter in light of the potential impact of the Jones letter and documents.

his case. Jones further related that he was keeping notes, "writing down everything" that Hmimssa told him, and because he believed that what Hmimssa had told him "about terrorist things" presented a "matter of national security of the highest priority," Jones asked AUSA Allen to inform the prosecuting attorney on Hmimssa's case that he had "verbatim" notes and that he was willing to take a polygraph test about his notes and his information about Hmimssa.

AUSA Allen stated at the December 12, 2003 post-trial evidentiary hearing that he received Jones's letter on February 11, 2002 and a few days later, gave the letter to Richard Convertino, the Assistant United States Attorney on this case.[4] Convertino acknowledged that he received the letter in mid-February 2002. [12/12/03 Tr., p. 87.] However, Convertino stated that the letter "struck [him] as absurd on its face." *Id.* at 89. For that reason and because he thought that Butch Jones had no credibility, Convertino made the unilateral determination that the letter did not constitute *Brady* material and, therefore, decided not to turn the letter over to the defense. Convertino further decided that "it was not worth the effort" to pursue any attempt to contact Jones regarding what he wrote in the letter or to obtain his notes

concerning Hmimssa. *Id.* at pp. 97–98, 101.

The letter issue resurfaced a year and a half later, during the course of trial in this matter. Joseph Capone, a Justice Department attorney who was monitoring the terrorism trial and who is also a long-time personal friend of AUSA Allen, discussed with Mr. Allen some of the evidence and testimony that was being presented during the trial. *See* 12/12/03 Hrg. Tr. p. 65. When Mr. Hmimssa's name came up in their discussion, Allen told Capone about the substance of Jones's letter. *Id.* After Hmimssa testified and the issue of the letter had not arisen in any form, it became apparent to Capone and Allen that the defense did not have the letter. *Id.* at p. 67. Allen, therefore, went to see Allen Gershel, supervisor of the Criminal Division of the U.S. Attorneys office in Detroit, to express his concern that the letter was not turned over to the defense. *Id.* at pp. 69, 82.[5] Gershel stated on the record on December 12 that after AUSA Allen came to him, that he had a meeting with Assistant U.S. Attorney Keith Corbett, Convertino's co-counsel on the terrorist case. *Id.* at p. 83. Gershel said that during this meeting he told Corbett to turn the letter over to the defense. *Id.* Corbett, however, stated at the December 12 hearing that he has no recollection of any such meeting

---

4. Although the Court did not require the attorneys appearing at the December 12 hearing to give sworn testimony or be subject to cross-examination, the Court, citing pertinent decisional precedent, advised all counsel that any statements they made at the hearing would be as officers of the Court and the Court would rely upon such statements as if they were under oath. 12/12/03 Hrg. Tr. pp. 8–9. *See Holloway v. Arkansas*, 435 U.S. 475, 486, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978) ("Attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath."). *See also Smith v. Anderson*, 689 F.2d 59, 64 (1982) (observing that statements made by an

attorney in his capacity as an officer of the court "are made as if upon oath") and A.B.A. Model Rules of Professional Conduct, Rule 3.3 (same).

5. Allen stated at the hearing that his discussion with Gershel during trial was the second time he had spoken with Gershel about the letter. He stated that he had first shown the letter to Gershel the same day that he gave it AUSA Convertino in February 2002. Gershel, however, stated that he had only a vague recollection of that prior conversation with Allen but could recall no details about it. 12/12/03 Tr., p. 82.

with Gershel and disputes that Gershel ever directed him to produce the letter. *See id.*, pp. 121–122. In any event, there is no dispute that the letter was never turned over to the defense in this case.

Youssef Hmimssa also testified at the December 12 hearing. He categorically denied saying anything to Jones at all about his case, and further specifically denied making any of the statements recounted by Jones in his letter, saying that his lawyer had advised him not to discuss anything about his case with anyone. *Id.* at pp. 38–43.

■■■ In order to decide whether the Government's belated post-trial production of the Jones letter constitutes a *Brady* or *Giglio* violation entitling Defendants to a new trial, the Court will be required to determine whether the letter contains information that meets *Brady*'s "materiality" requirements.[6] To aid in that determi-

nation, the Court called upon Butch Jones to testify at the December 12 evidentiary hearing. Jones, however, refused to answer any questions concerning the letter or his notes and, instead, invoked his Fifth Amendment privilege against self-incrimination.

Jones's position is that by answering any questions concerning the letter or his notes, he could be subjected to prosecution under 18 U.S.C. § 1001 for making a false statement to the Government. He also contends that his communication with AUSA Allen may be viewed as an attempt to curry favor with the Government, and could, therefore, be used against him as evidence of consciousness of guilt in the death penalty case presently pending before Judge O'Meara. Jones contends that his testimony concerning the subject matter of the letter and notes, as well as the act of producing these documents, are

---

**6.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). *Brady* requires the prosecution to provide the defense evidence which is favorable to the accused and material to guilt or innocence. *See Brady v. Maryland, supra; Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Evidence "favorable to the accused" includes exculpatory evidence and impeachment evidence. *See United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Evidence is "material" under *Brady* if "there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Brady v. Maryland, supra; United States v. Bagley, supra,* 473 U.S. at 682, 105 S.Ct. at 3383–84. Whether evidence is "material," however, does not depend upon whether the defendant would more likely than not have received a different verdict with the evidence, but rather whether, in its absence he received a fair trial, understood as a trial resulting in a verdict of confidence. *Id.* at 435–35, 115 S.Ct. at 1565–66.

A materiality finding is also required under *Giglio.* Pursuant to *Giglio,* when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting the credibility of that witness may require a new trial, irrespective of the good faith or bad faith of the prosecution. However, a new trial is not automatically required whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense. A new trial is called for under *Giglio* only when the nondisclosed evidence meets the *Brady* materiality requirements. *See Giglio v. United States, supra,* 405 U.S. at 153, 92 S.Ct. at 765.

Here, on its face Jones's letter contains information bearing on Hmimssa's credibility and which could have been used to impeach his testimony at trial. Therefore, in order to determine whether the Government's failure to produce the letter constitutes a violation of *Brady* and/or *Giglio,* the Court will have to conduct a *Brady* materiality analysis and determine whether there is a reasonable probability that, had the evidence been timely disclosed to the defense, the result of the proceeding would have been different.

cloaked with the privilege against self-incrimination.

## III. *DISCUSSION*

### A. *APPLICABLE GENERAL PRINCIPLES*

 The Fifth Amendment to the U.S. Constitution provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amend. V. This privilege against self-incrimination "protects a person ... against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976). It "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." *Kastigar v. United States*, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).

 "The privilege afforded by the Fifth Amendment not only extends to answers that would themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *United States v. Grable*, 98 F.3d 251, 256 (6th Cir.1996), *cert. denied*, 519 U.S. 1059, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997).

 This protection, however, is confined to instances where the witness "has reasonable cause to apprehend danger" of criminal liability. *Hoffman, supra.* As explained by the Court in *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), "The central standard for the... application of the Fifth Amendment is whether the claimant is confronted by substantial and 'real,' not merely trifling or imaginary, hazards of incrimination." *Id.* at 53, 88 S.Ct. at 705. *See also, Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972) (The privilege does not protect against "remote and speculative possibilities" of incrimination.)

 Furthermore, a witness is not exonerated from answering questions merely because he declares that in so doing he would incriminate himself—his say-so does not itself establish the hazard of incrimination. *Hoffman, supra.* It is the role of the court, not the witness, to evaluate the witness's claim of incrimination and determine whether it is reasonable. *Id.*

In evaluating the validity of a witness's invocation of Fifth Amendment privilege against self-incrimination, the court must make a particularized inquiry, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded. *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir.1976); *United States v. Rue*, 819 F.2d 1488 (8th Cir.1987). Thus, the court must review the witness's assertion of the privilege on a question-by-question basis and decide whether a witness's silence is justified. *In re Morganroth*, 718 F.2d 161, 167 (6th Cir.1983); *United States v. Grable, supra*, 98 F.3d at 257. As the Sixth Circuit instructed in *Grable*, this is best accomplished in an *in camera* proceeding wherein the court is able to "ask the right questions" and the witness is able to substantiate his claims of the privilege. *Id.*

Adhering to the Sixth Circuit's teachings, the Court conducted an *in camera* examination of Mr. Jones in light of the bases upon which the Fifth Amendment privilege against self-incrimination has been claimed by him.[6]

---

6. Although Defendants filed an "Objection" to the Court's conducting of an ex-parte *in cam-*

B. *THE FIFTH AMENDMENT PRIVI-LEGE DOES NOT ATTACH TO THE DOCUMENTS THEMSELVES*

 As an initial matter, it should be understood that Jones's letter and notes in and of themselves are *not* privileged. Jones concedes as much. It is well-settled that "if the party asserting the Fifth Amendment privilege has voluntarily compiled [a] document, no compulsion is present and the contents of the document are not privileged." *United States v. Doe,* 465 U.S. 605, 612 n. 10, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *United States v. Grable, supra,* 98 F.3d at 253; *Barrett v. Acevedo,* 169 F.3d 1155, 1167 (8th Cir. 1999), *cert. denied,* 528 U.S. 846, 120 S.Ct. 120, 145 L.Ed.2d 102 (1999). Jones was under no compulsion whatsoever when he wrote—and sent—the letter and compiled the notes at issue in this case. He acted completely voluntarily in doing so. It is only as to compelled *testimony* regarding such documents—which may, in some instances, include foundational testimony requiring a defendant to admit the existence, location or authenticity of the documents—that the privilege may apply. *Id.*

It is within these testimonial parameters that the Court will address Jones's claim of privilege with respect to the letter to AUSA Allen and Jones's personal notes of his conversations with Youssef Hmimssa.

C. *JONES'S CLAIM OF PRIVILEGE BASED UPON FEAR OF PROSE-CUTION UNDER 18 U.S.C. § 1001 IS NOT WELL–FOUNDED*

 As indicated above, the touchstone for applicability of the Fifth Amendment privilege is whether the claimant is confronted by substantial and "real" hazards of incrimination. In this case, Jones first bases his claim of privilege upon the possibility that he might be prosecuted for making a false statement to the Government in violation of 18 U.S.C. § 1001, which provides, in pertinent part, as follows:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals or covers up by any trick, scheme, or device a material fact [or]

(2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be fined under this title or imprisoned not more than 5 years, or both.

Making materially false statements to an Assistant United States Attorney with respect to a matter that was within the jurisdiction of the United States Attorney's Office is punishable under § 1001. *See United States v. Tracy,* 108 F.3d 473, 477 (2nd Cir.1997). *See also, United States v. Van Valkenburg,* 157 F.Supp. 599 (D.Alaska 1958) (false statements made to Assistant United States Attorney to induce action against third person were with regard to matter "within jurisdiction" of Office of United States Attorney).

With respect to the statements contained within Jones's December 30, 2001 letter to AUSA Allen, Jones's belief that his testimony concerning the letter could be used against him is based upon the statements of Government attorneys at the December 12, 2003 hearing and during the pre-hearing *in camera* conference with the Court that they viewed Jones as lacking credibility. "Obviously, if the prosecutors

era examination of Jones, the Sixth Circuit's directive in *Grable* establishes the propriety of the procedure followed in this case. More-

over, in light of the Court's disposition of this matter, *see infra,* Defendants have not been prejudiced in any way by this procedure.

don't believe the content of the letter, there is a basis for a reasonable belief by Milton Jones that the letter can be considered by the Government as a false statement within the meaning of 18 U.S.C. § 1001." [*Ex–Parte* Brief Under Seal on behalf of Milton Jones in Support of Assertion of Fifth Amendment Privilege, pp. 4–5.] Jones also points out that Youssef Hmimssa denied at the December 12, 2003 hearing that he spoke with Jones about any of the matters addressed in the letter. Jones posits, "If the Government credits Hmimssa, it is reasonable for Jones to fear that prosecutors may view the letter as containing false statements." *Id.* at p. 5.

First, to the extent that Jones bases his claim of privilege on the Government attorneys' statements regarding Jones's lack of credibility, Jones ignores the interests that the Government attorneys were protecting at the December 12 proceedings. The Government attorneys were attempting to justify their own actions in withholding evidence—i.e., Jones's letter—from defense counsel, in the hope of persuading the Court that they committed no *Brady* violation by doing so. It was by way of explanation as to why the decision was made not to turn the letter over to Defendants—i.e., that they viewed the letter as being of little or no evidentiary value to the defense—that Government attorneys Convertino and Corbett stated that, given Jones's criminal history, they doubted that Jones would be as a credible witness and further believed that there was "zero" probability that Jones would testify at trial.

■ More importantly, the very statements of the Government lawyers upon which Jones bases his claim of fear of incrimination actually demonstrate the unlikelihood of the Government prosecuting Jones for statements contained within the letter. The Assistant U.S. Attorneys'

statements negate any finding that the statements contained in the letter are "material." "Materiality" of the allegedly false statement is one of the elements that the Government must prove beyond a reasonable doubt in a § 1001 prosecution. *See* 18 U.S.C. § 1001; *see also, United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir. 1985) ("The elements of the § 1001 offense are that (1) the defendant made a statement; (2) that it false or fraudulent; (3) *and material;* (4) made knowingly and willfully; (5) and within the jurisdiction of a federal agency." *Id.* (emphasis added)); *United States v. Gaudin*, 515 U.S. 506, 509, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) (proof of materiality must be beyond a reasonable doubt). A statement is "material" under Section 1001, if it is "capable of influencing the decision of the decisionmaking body to which it was addressed." *Gaudin, supra; Chandler, supra.*

On the record on December 12, 2003, Government lawyers Convertino and Corbett both discounted out-of-hand the statements in Jones's letter as being of "no value or importance," and "not serious," going so far as to characterize the letter as a "joke" and the statements in the letter as "absurd." Specifically, AUSA Convertino stated:

> MR. CONVERTINO: [T]he letter struck me as absurd on its face. Mr. Hmimssa was involved in providing false documentation to the 9/11 hijackers was not accurate, since I knew that the 9/11 hijackers didn't use false identification. That Mr. Hmimssa was going to take over the country electorally, whatever that meant, was obviously absurd. And that the Bush family were narcotics traffickers as well. The other two items in the letter of note were that Hmimssa lied to the FBI and Hmimssa liked to or fooled, I think was the term, the Secret

Service. Those were in sum the five allegations in the letter that Mr. Hmimssa gave to Mr. Jones.

\*　\*　\*　\*　\*　\*

... And I did not think that the references included in the letter ... the specific references to things I just mentioned were of any value or importance. That was—I'm telling you, judge, this was my assessment.

\*　\*　\*　\*　\*　\*

... I showed the letter to Keith... for his review. He reviewed it. His assessment was the same as mine.

[12/12/03 Hrg. Tr., Statement on the Record of Richard Convertino, pp. 87–98.]

Based upon his own assessment of the letter, Convertino decided that "it was not worth the effort" to pursue any attempt to contact Jones regarding what he wrote in the letter. *Id.* at pp. 97–98, 101.

AUSA Corbett's assessment of the statements in the letter was similar to that of Convertino:

MR. CORBETT: [A]s I recall, Mr. Convertino brought the letter to me, showed it to me.... [My assessment was] much like Mr. Convertino's analysis now....

\*　\*　\*　\*　\*　\*

... Hmimssa had already testified [and] admitted he walked away from his cooperation agreement with the Secret Service... and [took] flight....

... I didn't view his charge [that the president was] a drug dealer as serious.

I didn't view his charge [that] Mr. Hmimssa intended to take this country electronically, or electorally, giving him the benefit of a spelling mistake [as serious]....

THE COURT: What about lying to the FBI?

MR. CORBETT: I believe he already admitted that on the witness stand.

[12/12/03 Hrg. Tr., Statement on the Record of Keith Corbett, pp. 116–124.]

Because materiality requires a finding that the information in question was "capable of influencing the decision of the decisionmaking body to which it was addressed," *Gaudin, supra; Chandler, supra,* Convertino's and Corbett's assessment of the letter demonstrates that in the Government's own view, the letter is not "material," as that term is defined under 18 U.S.C. § 1001.[7] Because proof beyond a reasonable doubt of the materiality of the statements in the letter would be required in a Section 1001 prosecution of Jones, inasmuch the Government's own lawyers on the record have denied materiality of the statements, the Court finds that Jones can have no "reasonable cause to apprehend danger" of criminal liability under Section 1001 for statements contained in the December 30, 2001 letter to AUSA Allen.

Furthermore, it must be kept in mind that the real issue in any Section 1001 prosecution would be only the truth of Jones's representations in the letter that

---

**7.** Furthermore, with respect to at least two of the statements in the letter—that Hmimssa told Jones that he "lied to the FBI" and "fooled the Secret Service agent on his case," both Convertino and Corbett admitted the truth of these two statements at the December 12 hearing. *See* 12/12/03 Hrg. Tr., pp. 99, 118. Having admitted the truth of these statements, the Government cannot base any claim of making a "false" statement on them.

The Court hastens to add that its analysis here as to "materiality" in the context of Jones's potential liability under 18 U.S.C. § 1001 has no bearing upon any *Brady/Giglio* inquiry it must make as to the materiality of the withheld information. This latter inquiry, of course, must focus on "materiality" as it applies to Defendants' fair trial rights, not the Government's view of the information.

*Hmimssa told Jones* the things he related in the letter, and not the underlying truth or falsity of what Hmimssa allegedly said. Hmimssa could have lied or fabricated what he told Jones but Jones could not be prosecuted if he truthfully related what Hmimssa told him.

 Having thoroughly reviewed the letter, the notes and the *in camera* testimony of Mr. Jones, the Court believes that the Government would be hard-pressed to prosecute Jones for false statements based upon his recounting of what Hmimssa told him as reflected in his letter and his personal notes.[8]

Finally, the Court believes Jones faces no reasonable prospect of Section 1001 prosecution for another reason: the letter and notes, and Jones's foundational testimony for them, have at least a superficial credibility. At the December 23, 2003 *in camera* hearing, Jones laid a thorough foundation for the letter and its content, as well as for that of his notes of his conversations with Hmimssa and the information conveyed by Hmimssa which is contained therein. Jones also explained precisely what was meant by what he wrote in the letter and his notes with regard to what Hmimssa told him.

The Court found Jones's sealed testimony concerning the notes and Hmimssa's statements to him to have at least a *prima facie* credibility for a number of reasons, although without the benefit of further discovery and cross-examination, the Court obviously cannot make a conclusive finding. First, the Court established through the December 12, 2003 testimony of Lieutenant Nina Trump of the Wayne County Sheriff's Department and supporting Wayne County Jail records, that Jones and Hmimssa were indeed housed in adjacent cells at the Jail between December 20, 2001 and January 8, 2002, just as Jones maintained in his letter and sealed testimony. *See* 12/12/03 Hrg. Tr., pp. 11–13 and Hrg. Exhibits 1A and 1B; *see also* Jones December 30, 2001 letter ("10 days ago—12–20–01—they move[d] me... to Ward # 604[and] put me in a cell right next to Youssef Hmimssa.")

Further, the information which Jones testified about, and which is reflected in his notes, was not information available in the public domain at that time; it could only have come from Mr. Hmimssa. Much of the information in the letter, and to a far greater extent the notes, did not become public—if at all—until much later at the trial itself. Significantly, however, portions of the information in both the letter and the notes track with striking accuracy information contained in FBI 302s and the testimony at trial. Because Jones and his attorney, Harold Gurewitz, both stated that Jones gave Gurewitz the notes within a month or two after he made

---

**8.** With respect to the personal notes which, according to the letter, Jones kept regarding what Youssef Hmimssa told him, the notes were never given to AUSA Allen or anyone else in the U.S. Attorney's office. As referenced in the letter, Jones recorded these notes following his conversations with Hmimssa while he and Hmimssa were incarcerated in adjacent cells in the Wayne County Jail in December 2001–January 2002. Jones testified at the sealed hearing that the notes remained in his possession for a month or two thereafter, and then, Jones gave the notes to his attorney, Harold Gurewitz. Pursuant to the Court's directive at the December 12 hearing, Mr. Gurewitz filed those notes under seal with the Clerk of the Court on December 17, 2003. [*See* "Sealed Submission Pursuant to Direction by the Court Submitted by Harold Gurewitz as Counsel for Milton Jones," (Docket entry No. 501).] Never having been given to the U.S. Attorney's office nor any other federal department or agency, and Jones having been under no compulsion by the Government to keep notes, the notes cannot independently support a charge of making a false statement to the Government.

them (i.e., in February or March 2002), there is no possibility that the notes could have been made by Jones after the information became public more than a year later.

Although in his December 12 testimony, Mr. Hmimssa flatly denied having spoken with Jones regarding matters addressed in the letter and notes, given these indicia of credibility, the Court believes that no reasonable prosecutor would bring "false statement" Section 1001 charges against Jones based upon these documents. The only way for the Government to establish that the letter and notes contain "false statements" would be by presenting the testimony of Youssef Hmimssa. Given the detail of the notes and particularly the fact that the information therein was not publicly available at the time the letter was written, and given that this Court has found Jones's testimony concerning these matters to be credible, the Court doubts that the Government would risk a prosecution that could be supported with nothing more than Hmimssa's bare denial of ever having spoken with Jones about these matters.

For all of the foregoing reasons, the Court finds that neither the December 30, 2001 letter to AUSA Allen nor Jones's contemporaneous notes which are referenced therein presents Jones with substantial and "real" hazard of being prosecuted under 18 U.S.C. § 1001. Therefore, the Court determines that Jones's invocation of his Fifth Amendment privilege against self-incrimination based upon fear of a Section 1001 prosecution is not well-founded.

## D. *JONES'S FEAR OF EVIDENCE BEING USED AGAINST HIM IN HIS PENDING CAPITAL CASE*

■ Jones's assertion of his Fifth Amendment privilege is also based upon his concern that the Government may view his letter to AUSA Allen as an attempt to curry favor with the Government and, as such, offer evidence of the letter against him as evidence of consciousness of guilt in the death penalty case presently pending before Judge O'Meara.

■ With respect to this aspect of Jones's claim of privilege, based upon the Court's *in camera* review of Jones's letter and notes and Jones's *in camera* testimony, the Court finds that there is nothing within the text of the letter or notes themselves, or on their face, which suggests any attempt to curry favor with the Government. Nowhere within the letter to AUSA Allen or his notes does Jones suggest any offer to provide evidence to the Government in exchange for leniency or seek to "cut a deal" with the government in exchange of information concerning Hmimssa. Where it is "perfectly clear to the court 'from a careful consideration of all of the circumstances in the case, that a witness is mistaken, and that [his] answer[s] cannot possibly have a tendency to incriminate,'" the witness may not invoke the Fifth Amendment privilege and refuse to testify. *In re Morganroth, supra,* 718 F.2d at 169 (quoting *Hoffman, supra,* 341 U.S. at 488, 71 S.Ct. at 819). Thus, no claim of privilege may lie as to consciousness of guilt with respect to the letter or notes themselves as the statements therein "cannot possibly have a tendency to incriminate" him in his capital case. *Hoffman, supra.*

■ The same is true of Jones's testimony authenticating the documents and explaining what he meant by what he wrote in the letter and notes with regard to what Hmimssa told him. As the Sixth Circuit emphasized in *Butcher v. Bailey,* 753 F.2d 465 (6th Cir.1985), *cert. denied,* 473 U.S. 925, 106 S.Ct. 17, 87 L.Ed.2d 696 (1985), "Authentication cannot be incrimi-

nating unless the contents of the document tend to incriminate." *Id.* at 470. Presumably, Jones's concern with respect to authentication and evidence of "consciousness of guilt" is that the letter is addressed to Assistant United States Attorney Allen. In and of itself, the Court finds nothing inherently incriminating or suggestive of an attempt to curry favor with the Government simply from the fact that a defendant wrote a letter to the prosecutor. However, even if this could be viewed as incriminatory, the Government already has possession of Jones's letter—Jones himself sent the letter to the Government—and the letter can be independently authenticated by AUSA Allen. Allen, in fact, has already authenticated Jones's letter on the record in this case, by handwriting recognition.[9] [*See* 12/12/03 Tr., p. 58.] Under these circumstances, any incrimination would be so trivial that the Fifth Amendment is not implicated. *See Marchetti v. United States, supra,* 390 U.S. at 53, 88 S.Ct. at 705 (holding that only "substantial and real" hazards of incrimination implicate the Fifth Amendment). Therefore, Jones may not refuse to authenticate the documents or answer questions about his summations in the letter or the content of his notes as to what Hmimssa told him.

## E. THE "ACT OF PRODUCTION" PRIVILEGE IS INAPPLICABLE

■■■■ Although Jones has argued for application of the Fifth Amendment privilege not only with respect to his testimony but also with respect to the "act of production" of the documents in and of itself, the Court finds that Jones' reliance on the "act of production" line of cases is misplaced. The cases that Jones relies upon involved production of documents in response to subpoenas and the courts have found that in such circumstances, the mere "act of production" may have testimonial aspects and thus, may implicate the Fifth Amendment. *See e.g., United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Butcher v. Bailey,* 753 F.2d 465 (6th Cir.1985). However, it is only if the act of production in and of itself would, in addition to being compelled, be *both* "testimonial and incriminating," that the Fifth Amendment privilege attaches. *Id.* (Emphasis added). Thus, there are two inquiries here: (1) is the act of production "testimonial"; and (2) is the act of production itself "incriminating"?

### 1. PRODUCTION OF THE LETTER AND NOTES WOULD NOT BE TESTIMONIAL

In *Butcher, supra,* the Sixth Circuit explained when the act of production may be deemed "testimonial":

Production of documents may be testimonial in any of three ways: by acknowledging that the documents exist; by acknowledging that they are in control of the person producing them; or by acknowledging that the person producing them believes they are the documents requested and thereby authenticating them for purposes of Fed.R.Evid. 901. *See Doe,* 104 S.Ct. at 1243 & n. 11. Production of documents is not considered testimonial if each of these considerations is a "foregone conclusion." *Id.* n. 13 (quoting [*United States v.*] *Fisher,* [425 U.S. 391,] 411, 96 S.Ct. [1569,] 1581 [ (1976) ]). In *Fisher,* for example, a taxpayer was requested to turn over his accountant's workpapers. The Court determined that such production was not testimonial because the existence and location of the documents were already known, 425 U.S. at 411, 96 S.Ct. at 1581, and the taxpayer's production of his ac-

---

**9.** *See* Fed. R.Evid. 901(b)(2).

countant's papers would not be authentication sufficient to admit the documents as evidence, *id.* at 413, 96 S.Ct. at 1582.

In *Doe,* on the other hand, a sole proprietor was asked to turn over his business records. He resisted, arguing that his production would admit the existence of the records and his possession of them, and would authenticate them for use at trial. Under those circumstances, the court deferred to the district court's finding that production would indeed be testimonial. *See Doe,* 104 S.Ct. at 1243 & n. 13.

753 F.2d at 469. *See also, In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992, supra* 1 F.3d at 93 ("While the contents of voluntarily prepared documents are not privileged, the act of producing them in response to a subpoena may require incriminating testimony in two situations: (1) "if the existence and location of the subpoenaed papers are unknown to the government"; or (2) where production would 'implicitly authenticate' the documents.")

The *Butcher* court found that the production at issue in that case was more similar to the circumstances presented in *Doe.* Although the court found that the existence and location of the documents were already known to the bankruptcy trustee and therefore, were a "foregone conclusion," it determined that the debtor's production of the records in response to an order of the bankruptcy court that he "surrender to the trustee all property of the estate and any recorded information, including books, documents, records and papers relating to property of the estate" would be, in and of itself, sufficient to authenticate them under Fed.R.Evid. 901(b)(1).[10] *Id.* Therefore, the court con-

cluded that the compelled production of the documents at issue would be testimonial. *Id.*

Applying the foregoing authorities to the facts of this case, the Court finds that the act of production privilege does not apply to either the letter to AUSA Allen or Jones's personal notes. As for the letter, it has already been voluntarily "produced"—by Jones himself. He sent it to the Government and it is already in the Government's possession. Therefore, no "production" of the letter, compelled or otherwise, is involved at all. There is simply no occasion whatsoever calling for the "act of production" privilege as to the letter.

 With respect to the notes, the existence and location of these documents were already made known to the Government—again by Jones himself, as he specifically told the Government he had taken "verbatim" notes of his discussions with Hmimssa and that he had these notes. *See* Jones letter, 12/12/03 Hrg. Ex. 2, pp. 2, 3 ("I'm taking notes, I'm writing everything down [that] he tell[s] me.... Know I have notes "verbatim" as it was told to me....") Production may not be refused on the basis of the act of production privilege "[i]f the government can demonstrate with reasonable particularity that it knows of the existence and location of subpoenaed documents." *In re Grand Jury Subpoena Duces Tecum, supra.* Thus, having been informed by Jones of the existence of the notes and his possession of them, the Government clearly can demonstrate with reasonable particularity that it knows of the existence and location of these documents.

Finally, simple compliance with a court order ordering production of the notes

---

**10.** Fed.R.Evid. 901(b)(1), states that "testimony of a witness with knowledge... that a matter is what it is claimed to be" satisfies the requirement of authentication which is a condition precedent to admissibility of evidence.

would not implicitly authenticate them. *Id.* The notes were prepared by Jones but are now in the possession of his attorney, Harold Gurewitz. An order for their production, thus, would necessarily be directed to Mr. Gurewitz. Compelling Gurewitz to produce the notes would not implicitly constitute authentication by Jones. Thus, production of the notes would not be testimonial.

## 2. *THE ACT OF PRODUCTION WOULD NOT BE INCRIMINATING*

Even assuming *arguendo* that the court-ordered production of the notes would be sufficient to establish Jones's authentication of them, i.e., that "the notes are what they are claimed to be," such that an argument might be made that the act of producing the notes would be "testimonial," the act of production privilege will attach to compelled production of documents only if the production is *both* testimonial *and* incriminating. *Butcher, supra,* 753 F.2d at 469–70.

After explaining in *Butcher* when the act of production may be deemed "testimonial," the Sixth Circuit addressed the question of whether, in addition to being "testimonial," the act of producing documents might be viewed as "incriminating," as required under *Doe* and its progeny for application of the privilege:

> We now address the question of incrimination.... There can be nothing incriminating about authenticating an innocuous document. Authentication cannot be incriminating unless the contents of the document tend to incriminate....
>
> ... Determining incriminating potential requires a factual inquiry which the lower court in this case did not conduct. The Bankruptcy Court ruled, as a matter of law, that debtor need not produce personal records if that production would be incriminating. We have indicated our agreement with that legal conclusion. On remand, the Bankruptcy Court must go further and determine, as a matter of fact, whether the production of specific records would be incriminating....
>
> * * * * * *
>
> We reiterate, however, that it is the act of authentication, rather than the contents or nature of the documents, which must be incriminating [for the act of production privilege to apply]. If the Bankruptcy Court determines that the authentication of any of the documents is a foregone conclusion, then it may order production of those documents regardless of their incriminating nature. On the other hand, if authentication is not a foregone conclusion, the debtor's act of authentication would be incriminating—as a link in the chain of evidence—only if the nature of the documents indicated that their contents might be incriminating.

*Id.* at 470 (citations omitted and emphasis added).

As the Sixth Circuit emphasized in *Butcher,* the act of authentication is incriminating only if the contents of the documents tend to incriminate. *Id.* at 470. As set forth above in this Opinion and Order, the Court has determined there is nothing incriminating in the content of the Jones letter or Jones's personal notes. Nothing in any of these documents suggest any attempt on Jones's part to curry favor with the Government nor does Jones condition any offer to provide the Government with information concerning Hmimssa in exchange for leniency in his capital case. Therefore, authentication of the documents would not incriminating. Furthermore, even when compelled production might be incriminating and, as such call for application of the Fifth Amendment privilege, the Government's ability to authenticate the

documents by other means negates the claim of privilege. *In re Grand Jury Subpoena Duces Tecum, supra; see also United States v. Walker,* 982 F.Supp. 288, 291 (S.D.N.Y.1997). Here, AUSA Allen has already authenticated Jones's letter, by handwriting recognition. [12/12/03 Tr., p. 58.] *See* Fed. R.Evid. 901(b)(2). The Government could also authenticate the notes by asking the court or an expert witness to compare the handwriting in the letter to that in the notes. *See* Fed.R.Evid. 901(b)(3).

For all of these reasons, the Court finds the "act of production" privilege inapplicable in this case.

## F. *SCOPE OF COMPELLED TESTIMONY OF MILTON "BUTCH" JONES*

Having thoroughly reviewed and considered Jones's letter and notes, his December 23, 2003 sealed testimony and the evidence and testimony presented at the December 12, 2003 hearing, the Court has determined that Jones can be required to produce the letter and notes and provide foundational testimony concerning them, as well as concerning his conversations with Youssef Hmimssa. Jones can further be required to testify about the circumstances under which he became acquainted with Hmimssa and engaged in conversations with him, what Hmimssa told him during his those conversations, and explain what was meant by what Jones wrote in his letter and notes about

what Hmimssa told him. As explained above in this Opinion and Order, as to these matters, the Court finds such testimony would not be incriminating and does not show an attempt to curry favor with the Government. Therefore, Jones's may not invoke the Fifth Amendment privilege against self-incrimination and refuse to testify about these matters.

■ This leaves only the question as to whether Jones may validly invoke his Fifth Amendment privilege as to any area of testimony he may be required to give in this case. The Court finds that any testimony elicited from Jones as to *why* he decided to write the letter to Allen or *why* he decided to keep notes of his conversations with Hmimssa might conceivably subject Jones to the risk of self-incrimination. For example, if in response to questions as to why he wrote the letter or kept the notes, Jones were to testify that he wrote the letter or kept the notes to help his position in the pending capital case against him, such testimony could potentially show consciousness of guilt through attempting to curry favor with the Government. The Government then could possibly offer that testimony as evidence against Jones in his capital case. Therefore, the Court finds that Jones may assert his Fifth Amendment privilege and refuse to answer any such questions in this case [11]

.

## CONCLUSION

In sum, for all of the reasons stated above in this Opinion and Order,

11. Obviously, this Court in this case cannot bind Judge O'Meara as to any findings that may by required in the case pending before him. However, the Court would obviously hope that its rulings here would not in any way disadvantage Jones in his capital case. In fact, it strikes the Court that it would be somewhat inequitable to allow the Government to benefit from any testimony compelled here, as it was the Government that withheld

the letter (including the reference to the notes), and allowing the Government to tacitly induce Jones's silence about them through the threat of using the documents against him in his case could unfairly deter Jones's testimony here and, thereby, undermine the Defendants' new trial motion and, potentially, their defense if any new trial were to be ordered.

IT IS HEREBY ORDERED that Milton "Butch" Jones may not invoke his Fifth Amendment privilege against self-incrimination in this case concerning the production or testimonial authentication of his December 30, 2001 letter to Assistant U.S. Attorney Joseph Allen or his personal notes of his conversations with Youssef Hmimssa. Nor may he invoke the Fifth Amendment and refuse to testify about the circumstances under which he became acquainted with Hmimssa and engaged in conversations with him, what Hmimssa told him during his those conversations, or what precisely was meant by what Jones wrote in his letter and notes about what Hmimssa told him.

IT IS HEREBY FURTHER ORDERED that the Clerk of the Court shall unseal the December 17, 2003 Sealed Submission of Harold Gurewitz (docket entry No. 501) and the contents thereof, being Milton "Butch" Jones's contemporaneous notes of his conversations with Youssef Hmimssa, and the original notes shall be returned to Mr. Gurewitz, with copies to be produced forthwith to all parties in this action.

IT IS FURTHER ORDERED that Jones may assert the Fifth Amendment privilege and refuse to answer any questions asked of him concerning his reasons for writing the letter, for keeping notes of his conversations with Hmimssa, or for giving those notes to his attorney.

SO ORDERED.